IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Tammy Lynn Edmond, ) | 2013 AUG 28 P 4: 02 |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 8:12-1081-RMG |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting Commissioner ) | |
| of Social Security, ) | **ORDER** |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff has brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). In accord with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 DSC, this matter was referred to a United States Magistrate Judge for pre-trial handling. The Magistrate Judge issued a Report and Recommendation on July 29, 2013, recommending that the Court reverse and remand the Commissioner's decision. (Dkt. No. 13). The Commissioner filed objections to the Report and Recommendation and the Plaintiff filed a reply. (Dkt. Nos. 16, 17). As more fully set forth below, the Court reverses the decision of the Commissioner and remands for further action consistent with this order.

**Legal Standard**

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo*

determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of the factual circumstances that substitutes the Court's findings of fact for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

Although the federal court's review role is a limited one, "it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). Further, the Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987).

The Commissioner, in passing upon an application for disability benefits, is required to undertake a five-step sequential process. At Step One, the Commissioner must determine whether the applicant is engaged in substantial gainful work. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful employment, the Commissioner proceeds to Step Two, which involves a determination whether the claimant has any "severe medically determinable physical or mental impairment." *Id.* § 404.1520(a)(4)(ii). If the claimant has one

or more severe impairments, the Commissioner proceeds to Step Three, which involves a determination whether any impairment of the claimant satisfies any one of a designated list of impairments that would automatically render the claimant disabled. *Id.* § 404.1520(a)(4)(iii). Where the claimant has multiple impairments but none satisfy independently the criteria for a listed impairment, the Commissioner is obligated to consider the combined effect of the various impairments and determine whether they are the medical equivalent of the criteria of a listed impairment. 42 U.S.C. § 423(d)(2)(B); *Walker v. Bowen*, 889 F.2d 47, 49-50 (1989); 20 C.F.R. § 416.926.

If the claimant does not have a listed impairment or the medical equivalent of a listed impairment, the Commissioner must proceed to Step Four, which involves an assessment of the claimant's Residual Functional Capacity ("RFC"). *Id.* § 404.1520(a)(4)(iv). This requires assessment of the claimant's ability "to meet the physical, mental, sensory, and other requirements of work." *Id.* § 404.1545(a)(4). In determining the claimant's RFC, the Commissioner "must first identify the individual's functional limitations or restrictions" and provide a narrative "describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8P, 61 Fed. Reg. 34474, 34475, 34478 (July 2, 1996).

Once the claimant's RFC is determined, the Commissioner must assess whether the claimant can do his past relevant work. 20 C.F.R. §§ 404.1520(4)(iv), 1545(a)(5)(i). If the claimant, notwithstanding the RFC determination, can still perform his past relevant work, he is deemed not to be disabled. If the claimant cannot perform his past relevant work, the Commissioner then proceeds to Step Five to determine if there is other available "work which

exists in significant numbers either in the region where [the claimant] lives or in several regions of the country" he can perform in light of the RFC determination. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to "show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

In making the necessary showing of the availability of "work which exists in significant numbers," the Commissioner may utilize the Dictionary of Occupational Titles ("DOT") and the testimony of a vocational expert. When a vocational expert testifies at an administrative hearing that there are available jobs in the national economy the claimant can perform, the ALJ has an "affirmative responsibility to ask about any possible conflict between the [vocational expert] . . . evidence and the information provided in the DOT" and "must elicit a reasonable explanation" for any conflict that may exist before relying on the testimony of the vocational expert. SSR 00-4P, 64 Fed. Reg. 75759, 75760 (Dec. 4, 2000).

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of medical sources, including treating physicians. 20 C.F.R. § 404.1545. The regulation, known as the "Treating Physician Rule," imposes a duty on the Commissioner to "evaluate every medical opinion we receive." *Id.* § 404.1527(c). The Commissioner "[g]enerally . . . give[s] more weight to opinions from . . . treating sources" based on the view that "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations." *Id.* § 404.1527(c)(2). Further, the Commissioner "[g]enerally . . . give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." *Id.* § 404.1527(c)(1).

Under some circumstances, the opinions of the treating physicians are to be accorded controlling weight. Even where the opinions of the treating physicians of the claimant are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of specifically identified factors, including the examining relationship, the nature and extent of the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician is a specialist. *Id.* §§ 404.1527(c)(1)-(5). The Commissioner is obligated to weigh the findings and opinions of treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96-2P, 61 Fed. Reg. 34490, 34492 (July 2, 1996).

## Factual Background

The claimant, then 42 years of age, underwent a total left hip arthroplasty on September 18, 2006, to correct a congenital hip dysplasia. Transcript of Record (hereafter "Tr.") at 262-63. In this same surgical procedure, Plaintiff's orthopaedic surgeon, Dr. Randall Suarez, performed a leg lengthening procedure to correct a leg length discrepancy. *Id.* Almost immediately following the surgery, Plaintiff began complaining of severe left leg pain and some form of nerve damage during the leg lengthening procedure was the suspected cause. Tr. at 259, 274-75. Plaintiff was diagnosed with left foot drop secondary to suspected sciatic nerve stretching. Tr. at 283, 292. Over the ensuing months, Dr. Suarez noted some improvement with Plaintiff's left leg pain but the pain persisted and Plaintiff was unable to dorsiflex her left ankle. Tr. at 288-90. In early

2007, Dr. Suarez noted that Plaintiff's pain had extended into her left toes and she was documented at physical therapy with frequent left hip and foot pain, particularly when sitting for a long time and walking. Tr. at 304, 316, 343.

Dr. Suarez noted in a June 6, 2007 office note that both he and his patient were "discouraged" with lack of motor function and other difficulties with her left foot. Tr. at 340. He noted the lack of active dorsiflexion of the ankle and foot and the "strange pains" she was now experiencing in her toes. *Id.* Dr. Suarez also documented his disagreement with the denial of disability benefits to Plaintiff, stating "I do not think there is any way this lady can work right now the way she is. I strongly disagree with their determination . . . ." *Id.* Plaintiff was then referred to a neurologist, Dr. Mark Lencke, for further evaluation of her suspected nerve injury. After conducting various studies, Dr. Lencke determined that Plaintiff had "definitive abnormalities" of the left peroneal motor nerve that he believe reflected a "compressive lesion at the fibular head." Tr. at 344.

Following the definitive diagnosis of a compressive nerve injury, Dr. Suarez noted some small improvement in Plaintiff's condition. Tr. at 406-07. On December 11, 2007, more than 14 months since her nerve injury, Dr. Suarez documented that Plaintiff "has slowly made some recovery" but "she continues to have foot drop and difficulty with ambulation." Tr. at 357. He further stated that "[i]t is unclear if she will ever regain full use of the leg again" and she "is unable at this time to participate in her usual profession." *Id.* Several months later, on March 18, 2008, Dr. Suarez documented that Plaintiff's sciatic nerve injury has "resulted in chronic pain and . . . partial paralysis of the lower leg from the knee down. In other words, she had no ankle, foot or toe dorsiflexion, decreased sensation and painful sensations." Tr. at 356. He noted that

there had been some improvement in Plaintiff's condition but it "has not resolved." *Id.*

Plaintiff returned to Dr. Suarez in January 2008 still complaining of pain and "discouraged with this long process and not being over it." Tr. at 404. He sent her back to physical therapy, where she was documented with "very little feeling in her lower leg, foot and ankle except for pain." Tr. at 363. Over the ensuing months of therapy, Plaintiff made very limited progress and therapy was discontinued in mid-March 2008.

Dr. Suarez saw Plaintiff in his office on March 16, 2008, and documented his first (and only) truly optimistic note during his treatment of Plaintiff. He documented that "[s]he seems to be getting better and better" and was able to ambulate without a crutch or cane. Tr. at 402. He noted she had improved and the pain "is really not bad." *Id.* He observed that it had been about two years since her injury and "we are seeing some improvement." *Id.*

Dr. Suarez's optimism soon faded. In a summary dated August 5, 2008, Dr. Suarez observed that while Plaintiff's pain was better "she is still plagued with discomfort in the foot, intermittent pain which is almost constant pain particularly with ambulation of any distance." Tr. at 372. He noted that "[t]he more she walks, the more discomfort she has." *Id.* He also documented that medications prescribed for Plaintiff's condition, including Oxycodone and Lyrica, make her "drowsy and sleepy." Tr. at 373. He concluded that Plaintiff's condition will "likely not improve from this point" and "[s]he will have constant pain problems with this foot." *Id.*

On that same day, August 5, 2008, Dr. Suarez completed an impairment questionnaire in which he described Plaintiff's pain as "severe" and interfered with her ability to concentrate and ambulate. Tr. at 376, 378. He opined that the patient's condition limited her to sitting no more

than two hours per day and she was unable to stand or walk for any period of time. Tr. at 377. Dr. Suarez further stated that the claimant would need to take up to four unscheduled breaks in each eight hour day and would likely miss more than three days every month due to her impairments. Tr. at 379.

Dr. Suarez saw Plaintiff again on April 15, 2009, and he confirmed that she continued to have pain in her left leg, "more spasms," and some buttock pain. Tr. at 401. He noted, however, that she was getting "some foot dorsiflexion" but that "[i]t is clear that she continues to have sciatic nerve pain." *Id.*

Ms. Elizabeth Sweat, a licensed professional counselor, evaluated Plaintiff on June 4, 2008, following quarterly treatment beginning on January 28, 2008. Tr. at 382. She documented the claimant's "blunted affect" and "intermittent tearfulness" that were "likely due to chronic pain issues" and diagnosed her with "adjustment disorder with depressed mood." Tr. at 382-83. Ms. Sweat also opined that Plaintiff was incapable of performing even low stress work due to her chronic pain, medications, and depressive symptoms and would likely be absent more than three days per month due to her impairments. Tr. at 388-89.

Two state consultants, neither of whom examined the claimant or provided her any medical treatment, reviewed Plaintiff's medical records. Dr. Robert Kukla provided a chart review on May 21, 2007, concluding that Plaintiff could lift 10 lbs., sit for six hours a day, and stand or walk at least two hours per day. Tr. at 325. Dr. Kukla did not provide any documentary support for these opinions. Another chart reviewer, Dr. James Weston, reached identical conclusions in a report dated October 26, 2007, and he also failed to identify any documentary support for his conclusions. Tr. at 346.

Plaintiff testified at the administrative hearing conducted on September 2, 2009. She stated that she daily experienced leg and hip pain and was unable to mop, sweep, vacuum, take out the trash, or perform yard work because of her pain. Tr. at 46-47, 49, 50-52, 62. She testified she could do "light" laundry, dress herself, go to the grocery store, and provide for her basic self care needs. Tr. at 45-46. Plaintiff testified that some days are worse than others, with about four days a week being what she described as "bad." Tr. at 60. She stated she could not sit more than 30 minutes at a time and could walk no longer than two minutes. Tr. at 61. Plaintiff testified that she daily takes Lortab and Lyrica to control her pain symptoms from a prescription provided by Dr. Suarez. Tr. at 65.

Plaintiff explained that she had worked all her life until she experienced the nerve injury in the course of the September 2006 surgery and has never been able to return to work since then. In addition to the chronic pain she experiences, she stated that she had depressive feelings about this change in her life that has left her physically limited and in pain. Tr. at 58-59, 77. She explained:

> So it's not only physical, it's a lot physical, but it's a lot mental. And it's not to be taken lightly. I've worked all my life and don't have a problem with it. And for this to just happen to–it's changed my world around. . . . It has made a big difference in my life physically and mentally.

Tr. at 77-78.

The Administrative Law Judge ("ALJ") issued a decision on December 4, 2009, denying Plaintiff disability benefits on the basis that she retained the RFC to perform sedentary work so long as it was performed in a low stress environment. Tr. at 26. In reaching that conclusion, the ALJ found that Plaintiff had the following severe impairments: "congenital hip dysplasia;

degenerative joint disease; status post left total hip arthroplasty with leg extension; traumatic injury to the sciatic nerve producing left foot drop; right shoulder impingement syndrom; obesity; and adjustment disorder with depressed mood." Tr. at 25. The ALJ gave "little weight" to the opinions of Plaintiff's long-treating orthopaedic surgeon, Dr. Suarez, contending that his various summaries and questionnaire response were "in stark contrast to his treatment notes." Tr. at 30. The ALJ gave only "partial weight" to the opinions of Ms. Sweat, rejecting her opinions that the claimant was not capable of performing low stress work and would be absent more than three days per month because these opinions were "not supported by any treatment notes." Tr. at 31. In contrast, the ALJ did give "significant weight" to the opinions of Drs. Kukla and Weston, identifying them only as the "state agency medical consultants" and provided no basis for reliance upon the opinions of these non-examining physicians over the opinions of Plaintiff's treating health care providers under the standards of the Treating Physician Rule. Tr. at 27-28. The ALJ also did not identify the specific opinions of the chart reviewers upon which he relied. Further, the ALJ, while addressing Plaintiff's various orthopaedic and emotional impairments separately, never set forth in any detail the combined effect of all of these severe impairments on her ability to sustain work.

Having concluded that Plaintiff had the RFC to sustain sedentary work so long as performed in a low stress environment, the ALJ was then required to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform. The ALJ found that Plaintiff was not able to perform her past relevant work as a caregiver/aide, thus leaving the only issue availability of other jobs Plaintiff could perform. Tr. at 31. The ALJ posed to the vocational expert an initial hypothetical that included only physical limitations and

then added to that hypothetical the requirement that the job have "lower stress." Tr. at 71-74. The addition of the low stress requirement appeared to trouble the vocational expert and he observed there were a "few jobs" that might meet the hypothetical. Tr. at 75. The vocational expert then identified quality control examiners, material handlers, and assemblers as being "close to a comprehensive list at the sedentary and unskilled level" and provided DOT numbers allegedly assigned to each of these positions. *Id.*[1] The ALJ did not ask the vocational expert if his testimony was consistent with the DOT or that, if not, why the ALJ should rely on the vocational expert's opinion over the DOT. Nonetheless, the ALJ adopted the opinions of the vocational expert and concluded that Plaintiff was not disabled because there did exist a significant number of jobs in the national economy that the claimant, despite her severe impairments, could perform. Tr. at 32-33.

## Discussion

**1.     Failure to make an inquiry to the vocational expert whether any conflict exists between his testimony and the DOT and, if so, to determine the nature of the conflict and whether the explanation provided by the vocational expert was accepted**

As ably set forth by the Magistrate Judge in her Report and Recommendation, the ALJ's handling of the vocational expert's testimony violated multiple provisions of Social Security Ruling SSR 00-4P. (Dkt. No. 13 at 22-24). These include the ALJ's failure to inquire to the vocational expert whether there existed any conflict between his opinions and the DOT and to address the conflict between the DOT and the vocational expert's testimony regarding the quality

---

[1] It is uncontested that the job designation numbers assigned by the vocational expert for two of the three designated positions, material handlers and assemblers, do not exist in the DOT. (Dkt. Nos. 9 at 13; 10 at 21).

-11-

control examiner position. (*Id.*). Further, the ALJ relied on the testimony of the vocational expert regarding the availability of positions using codes that do not match job listings in the DOT. (*Id.*). The Court hereby adopts that portion of the Magistrate Judge's Report and Recommendation regarding the vocational expert's testimony and agrees that reversal and remand is the appropriate remedy under the circumstances. (*Id.* at 18-24). On remand, the ALJ should carefully reexamine the testimony of the vocational expert to determine whether the Commissioner can carry her burden at Step Five and address whether the possible availability of some low stress quality control examiner positions would constitute work existing in significant numbers in the national economy.

### 2.     Failure to adhere to the Treating Physician Rule

An essential element of the Commissioner's decision denying disability benefits to Plaintiff is the rejection of the opinions of the claimant's long-treating orthopaedic physician, Dr. Suarez, and her licensed professional counsel, Ms. Sweat. Both concluded that Plaintiff lacks the physical and/or mental capacity to sustain work. Tr. at 340, 356-57, 372-80, 382-89. The ALJ rejected the multiple opinions offered by Dr. Suarez on the basis that they were "in stark contrast" to his treatment notes, which allegedly show that "the claimant continued to make progress." Tr. at 30. The ALJ also rejected Ms. Sweat's opinions that Plaintiff cannot sustain even a low stress position and would experience significant absenteeism on the basis that she did not provide any treatment notes to support these conclusions. Tr. at 31. A careful review of the record taken as a whole fails to provide substantial evidence to support these findings of the ALJ and the rejection of the opinions of these treating health care providers. Moreover, the rejection of the opinions of these treating providers in favor of unnamed chart reviewers and their unstated

opinions reflects a manifest disregard for the Treating Physician Rule.

The record clearly demonstrates that Plaintiff experienced a severe nerve compression injury as a result of her September 18, 2006 surgery. While the record documents some return of marginal dorsiflexion in the left ankle and some waxing and waning of the initial excruciating pain she was experiencing, the record also documents that the patient never was able to restore any consistent level of function to her ankle or to avoid severe pain, particularly when she attempted to ambulate on her injured left leg. Tr. at 288-92, 304, 316, 339-40, 344, 356-57, 363-64, 403, 372-80, 401, 405-07. The one exception is a single optimistic note by Dr. Suarez dated April 16, 2008, in which Plaintiff appeared to realize some real improvement and pain relief. Tr. at 402. However, subsequent notes of Dr. Suarez and Ms. Sweat make clear this improvement was fleeting and a single "good day" over years of documented impairment and pain should not form the basis of a denial of Social Security disability benefits. Contrary to the findings of the ALJ, the record is replete with documentation to support the opinions of Dr. Suarez. As referenced in the citations above, these included the treatment notes and summaries of Dr. Suarez, the progress notes from physical therapy, the reports of the treating neurologist, Dr. Lenke, and the report of Ms. Sweat.

The Court finds particularly troubling the rejection of the opinions of Plaintiff's treating providers in favor of two chart reviewers, Drs. Kukla and Weston, who never examined Plaintiff and never explained the basis of their opinions that she could stand and walk for two hours at a time and sit for six hours in an eight-hour day. Tr. at 325, 342. Under the Treating Physician Rule, the ALJ should have weighed such factors as the examining relationship, the nature and extent of the treatment relationship, supportability of the opinions in the medical record,

consistency, and whether the provider was a specialist. 20 C.F.R. § 404.1527(c)(1)-(5). This type of side-by-side comparison was never provided, simply the adoption of the opinions of the unnamed chart reviewers over the treating providers.

The ALJ's failure to adhere to the requirements of the Treating Physician Rule mandate reversal and remand. On remand, the ALJ should review the evidence in the record taken as a whole and apply that evidence to the clearly set forth standards of the Treating Physician Rule. Under such standards, it would appear that the opinions of Dr. Suarez, as an examining and long-treating specialist, should be given special deference, and should not be discarded without far more justification than has been provided to date. The opinions of Ms. Sweat, as a treating and examining provider, should also be given considerable deference and not rejected without sufficient and appropriate justification. Such proper application of the Treating Physician Rule may have a significant impact on the Commissioner's determination of RFC at Step Three and on the availability of work to Plaintiff in the national economy at Step Five, particularly in light of the vocational expert's testimony that significant absenteeism and need for unscheduled breaks would render the claimant unable to work in a competitive job market. Tr. at 75-76.

### 3. Failure to consider the cumulative effects of Plaintiff's impairments

It is well settled that the effects of a claimant's multiple impairments must be evaluated cumulatively and "the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d at 49-50; 42 U.S.C. § 423(d)(2)(B). A simple statement by the ALJ that he has considered the combined effects of the claimant's impairments is not sufficient. Moreover, the evaluation of the cumulative effects of the claimant's impairments must be considered at each stage of the Five-Step process.

The ALJ identified a broad range of severe impairments of Plaintiff, including the sciatic nerve injury, shoulder impingement syndrom, and adjustment disorder with depressed mood. These severe impairments are addressed at Step Three consideration of listings serially but not collectively at this step or any other step. Tr. at 25-26. This is not an immaterial oversight because a claimant's multiple orthopaedic impairments along with depression may have a greater impact on the claimant's capacity for work than any single impairment standing alone. Indeed, Plaintiff quite ably described the combined effects of her physical impairments and depression at the administrative hearing. Tr. at 77-78. The failure of the ALJ to consider and articulate the combined effect of Plaintiff's impairments mandates reversal and remand. On remand, the ALJ should address the combined effects of Plaintiff's multiple impairments at every step of the evaluation process.

## Conclusion

The Court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands in accord with the instructions set forth above. In light of the protracted nature of these proceedings, now more than six years from the initial application for disability benefits, the Court directs that the decision on remand be issued by the ALJ within 90 days of this order and that any appeal, if necessary, reflect this case as a related action.

AND IT IS SO ORDERED.

Richard Mark Gergel
United States District Judge

August 28, 2013
Charleston, South Carolina